NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1113-12T4

ALLIED BUILDING PRODUCTS
CORP.,

     Plaintiff,

v.

J. STROBER & SONS, LLC,
SUSAN F. STROBER, Individually,
STEVE STROBER, Individually,
and ARCH INSURANCE COMPANY,

     Defendants,

and

DOBCO, INC.,

     Defendant-Appellant,

and

COLONIAL SURETY COMPANY,

     Defendant-Respondent.

APPROVED FOR PUBLICATION

September 5, 2014

APPELLATE DIVISION

---

Argued September 11, 2013 — Decided  September 5, 2014

Before Judges Grall, Nugent and Accurso.

On appeal from Superior Court of New Jersey,
Law Division, Bergen County, Docket
No. L-601-10.

Christopher Nucifora argued the cause for
appellant (Kaufman, Dolowich & Voluck, LLP,
attorneys; Mr. Nucifora and Antonio J.
Casas, on the briefs).

Greg Trif argued the cause for respondent
(McElroy, Deutsch, Mulvaney & Carpenter,
LLP, attorneys; Mr. Trif and Adam R.
Schwartz, of counsel and on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

In this action on a surety bond, Dobco, Inc. (Dobco) appeals from a September 19, 2012 final judgment denying its motion for partial summary judgment against Colonial Surety Company (Colonial), surety for J. Strober & Sons, LLC (Strober), Dobco's subcontractor, and granting Colonial's motion for summary judgment dismissing Dobco's cross-claims[1] against Colonial. The Law Division dismissed Dobco's claims against Colonial under the bond on the ground that the bond did not name Dobco as the obligee and because Dobco had rejected the bond as not in the form required by its subcontract with Strober. We deem neither of those facts material because we conclude that in entering into its surety contract with Strober, Colonial

---

[1] This action began as a book account complaint by Allied Building Products Corp. (Allied), a material supplier to Strober, against Strober, Dobco and Colonial. Dobco's affirmative claims against Colonial were thus properly denominated as cross-claims in that action. Because Allied's claims, which were resolved prior to these motions, are irrelevant to the issues before us, we do not discuss them.

obligated itself to issue a performance bond to Dobco in the form annexed to the Dobco/Strober subcontract. Accordingly, we reverse.

The facts adduced on the motions establish that Dobco was the general contractor to The William Patterson University (WPU) for a project referred to as the "Science Hall Addition, Renovation, and Greenhouse." Strober bid for and was awarded a subcontract for the roofing work. Dobco and Strober entered into a standard AIA ("American Institute of Architects") form of agreement on November 11, 2008. The agreement required Strober to furnish performance and payment bonds in the amount of $890,000, in the forms annexed to the agreement, prior to commencing work.[2] Strober applied to Colonial, the surety that had furnished Strober's bid bond for the project, for its performance bond.

Colonial is a Pennsylvania company, licensed in New Jersey as a property and casualty insurer. The company specializes in contract surety and fidelity. By it's president's account, Colonial does not "write business" in the way other insurers do. Upon establishing a "partnership account" with Colonial, a

---

[2] As only the performance bond is at issue here, we limit our discussion to it, although acknowledging that it was issued in tandem with the payment bond and the premium Strober paid Colonial was apparently for both bonds.

contractor is provided a "line of surety" with single and aggregate limits, a power of attorney and Colonial's seal. When the contractor wants to obtain a bid bond for a project, it uses its partnership account code to log into Colonial's website, inputs the project information and prints out the bond and consent of surety. The contractor signs the documents on behalf of Colonial using its power of attorney, applies Colonial's seal and submits the bond and consent of surety with its bid.

If the contractor wins the contract, it updates the online information provided previously and requests issuance of the performance bond. Colonial then has one of its bond administrators make inquiries regarding the bid spreads between the top few bidders, the identity of the architect and the engineer's estimate.[3] The package is then submitted to

---

[3] Colonial's witnesses testified at deposition about the inquiries made in this matter with reference to notes on a bid bond request form printed the day before Colonial issued its performance bond. Colonial's underwriter testified that the notes would have been created by the bond administrator in the normal course of approving Strober's request for the performance bond and that the information reflected in the notes was in hand before the underwriter approved the issuance of the bond on February 25, 2009. Among other things, Colonial's notes on this document, which is not in the appendix, indicate that Dobco was the general contractor on the project and also state "Science Hall subcontractor to general contractor." Although the notes might appear to suggest that Colonial had actual knowledge of the true state of Strober's role in the WPU project before Colonial issued its performance bond, we cannot draw that
(continued)

Colonial's underwriter for his approval.  Significantly, however, Colonial does not request or review the actual contract prior to issuing a performance bond.  Colonial's president testified at deposition that Colonial's "general policy is not to request a copy of the contract."  When asked why, the president responded "General — just don't.  Never do."  When asked how Colonial "would . . . verify that it is bonding the correct contract, if it never reviews the contract" prior to issuing the performance bond, the president responded "[v]erification, in my opinion, is not necessary.  That's why we don't review the contract."  Colonial did not review the Strober subcontract before issuing the performance bond at issue here.

The parties agree that Strober submitted a bid bond for the project through Colonial's online system and that Colonial followed its usual procedures in issuing the performance bond on February 26, 2009.  The bond provides in pertinent part:

> That J Strober & Sons, LLC, Ringoes, NJ as Principal, hereinafter called Contractor, and COLONIAL SURETY COMPANY a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, as Surety, hereinafter called Surety, are held and firmly bound unto

---

(continued)
conclusion on this record and do not rely on any such knowledge by Colonial here.

> William Patterson University, Wayne, NJ
> 07470
>
> as Obligee, hereinafter called the Owner, in
> the amount of
>
> Eight Hundred Ninety Thousand Dollars and No
> Cents Dollars ($890,000),
> for the payment whereof Contractor and
> Surety bind themselves, their heirs,
> executors, administrators, successors and
> assigns, jointly and severally, firmly by
> these presents.
>
> WHEREAS, Principal has by written
> agreement dated November 11, 2008, entered
> into a contract with the Owner for Science
> Hall Addition to William Patterson
> University[.]
>
> In accordance with drawings and
> specifications prepared by (here insert full
> name, title and address) Hellmuth, Obata &
> Kassabaum, 620 Avenue of the Americas, 6th
> Floor, New York, NY 10011 which contract is
> by reference made a part hereof, and is
> hereinafter referred to as the Contract.
>
> NOW THEREFORE, THE CONDITION OF THIS
> OBLIGATION is such that if Contractor shall
> promptly and faithfully perform said
> Contract, then this obligation shall be null
> and void; otherwise it shall remain in full
> force and effect.

While the bond bears the correct date of the Dobco/Strober

subcontract, it misidentifies the obligee as WPU, the owner,

instead of Dobco, WPU's general contractor and the party to whom

Strober promised the bond in the November 11, 2008 written

agreement.  Strober paid Colonial the full $16,350 premium for

the performance bond.

A-1113-12T4

Following Strober's delivery of the bond and accompanying documents to Dobco, Dobco wrote the following memorandum to Strober.

> We are in receipt of the performance and payment bond # CSC-216974 dated February 26, 2009.
>
> As identified in the AIA A401 Standard Form of Agreement Between Contractor and Subcontractor dated November 11, 2008, we required the performance and payment bond to be issued on a specific form. The performance and payment bonds we received do not comply with that requirement. Please re-issue the performance and payment bond on those forms. A copy of the forms are attached with this memorandum. Please provide the re-issued performance and payment bond no later than March 16, 2009. Thank you for your cooperation.

The parties dispute whether Dobco returned the performance bond to Strober. Dobco maintains that it retains the bond in its possession. Strober, which is not a party to this appeal, maintains that Dobco returned the bond and that it, in turn, returned the bond to Colonial. Colonial denies that the original bond was ever returned to it.

Upon receipt of Dobco's memorandum, Strober, using Colonial's power of attorney and seal, executed performance and payment bonds on Dobco's forms and telefaxed a copy to Dobco. Colonial contends this second set of bonds is a nullity as its agreement with Strober limited Strober to issuing bid bonds on

Colonial's behalf. Upon receiving the second set of bonds, Dobco sent Strober the following memorandum.

> We are in receipt of the revised performance and payment bond # CSC-216974 dated February 26, 2009. A copy of which is attached.
>
> The revised performance and payment bond is not acceptable. The performance and payment bond must be revised and issued by Colonial Surety Company with accompanying Surety Disclosure Statement and Certification, General Power of Attorney, and Financial Statement.
>
> Please provide the re-issued performance and payment bond no later than March 18, 2009. A failure to provide this requirement by that day may delay the process of any payments to your company. Thank you for your cooperation.

Strober did not provide revised bonds to Dobco but delivered material to the project site in April and began work in May. In early May, Dobco personnel complained to Strober about its work and noted that Strober had yet to respond to its request that Colonial reissue the bonds. Strober, in turn, asked Colonial to reissue the bonds on Dobco's forms. Colonial, however, had become aware that Strober was experiencing financial difficulties and instead asked for updated financial information from Strober.

Strober continued to prod Colonial for revised bonds and was several times advised by Colonial that "it is in underwriting," notwithstanding that Colonial had already issued

8

the bond and Strober had already paid for it.  The record contains evidence of several exchanges between Strober and Colonial regarding the subcontract's requirement that the bonds be issued on Dobco's form, Colonial's underwriter's discomfort with Dobco's form and his suggestion that Strober approach Dobco with other bond forms, the strength of Strober's finances and whether Colonial was willing to continue to bond the company going forward.

On July 21, Strober advised Dobco that "[w]e will . . . be forwarding the bond."  On July 24, Strober wrote to the underwriter at Colonial asking that he "confirm the status of our William Patterson Bond."  Strober wrote that "[w]e received it, paid for it, but had to send the original back to have it on another form as per our GC.  Please confirm the status."  Later that same day, Strober sent the following email to Dobco, copying the underwriter at Colonial.

> Hossam.  I've reached out to our Bond
> company on several occasions requesting the
> Wm. Patterson Bond being re-sent on the form
> you requested.  The bond is active but I'm
> unable to get this on your form as quickly
> as you would like.  As soon as they change
> the form I will forward to you.  I've cc'd
> the bond co[.] as well.  Thanks[.]

Dobco called Colonial and was also advised the bond was active. On July 27, Strober sent an internal email, copying the underwriter at Colonial, advising that the underwriter was "not

real comfortable with [Dobco's] form," and would review the contract provision requiring that the bond be issued in that format.

Dobco subsequently terminated Strober, which thereafter sought bankruptcy protection. Dobco filed a claim against Colonial under the bond. Colonial denied the claim on the basis that Dobco rejected both sets of bonds, both sets of bonds name WPU as the obligee, and Dobco knew or should have known "that the Alleged Second Bonds were unauthorized and that there was never an agreement between Strober and WPU in connection with the Project." Colonial claimed that "[n]either the Bonds nor the Alleged Second Bonds are in effect nor subject to claim by Dobco." Colonial has never revoked the bonds nor returned the premium to Strober.

After hearing argument on the parties' cross-motions, the Law Division judge issued a written opinion granting summary judgment to Colonial dismissing Dobco's claims. Relying on well-settled law "that a surety is chargeable only according to the strict terms of its undertaking and its obligation cannot and should not be extended either by implication or by construction beyond the confines of its contract," Monmouth Lumber Co. v. Indem. Ins. Co. of N. Am., 21 N.J. 439, 452 (1956), the judge found that WPU and not Dobco was the

10                                                          A-1113-12T4

designated obligee under both sets of bonds. The judge further found that Dobco rejected both the first and second set of bonds and thus no valid contract was formed between Colonial and Dobco.

The judge rejected Dobco's claim for reformation as the language of the bond was "clear and not ambiguous" and there was no evidence of mutual mistake because "[t]he undisputed evidence establishes that at the time of issuance, Colonial was unaware that the bonded subcontract agreement was between Strober and Dobco." The judge acknowledged "Dobco's general argument that Colonial had a duty to read and approve the underlying contract mentioned in the bond agreements" but found that "Dobco has not supported said argument or conclusion with facts or competent expert opinion that Colonial, the surety in this particular matter, or any surety as a matter of standard industry practice, had a duty to do so."[4] This appeal followed.

Dobco contends that the trial judge erred in concluding that Dobco had no rights under the bond or Strober's contract with Colonial and further erred in concluding on summary judgment that Dobco rejected the bonds. We review summary

---

[4] The judge also addressed and rejected Dobco's claims under an assignment from WPU and the application of equitable estoppel. As our resolution of the appeal makes it unnecessary to reach these claims, we do not discuss them.

judgment using the same standard that governs the trial court. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). Our first task here is thus to determine whether the motion judge was correct in determining that Dobco had no rights under the bond or Strober's surety contract with Colonial. See Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div.), certif. denied, 154 N.J. 608 (1998). Because a trial court does not enjoy the advantage in discerning the law that it does in discerning the facts, a reviewing court owes no special deference to the "trial court's interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"'Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default or miscarriage of another, the principal.'" Eagle Fire Prot. Corp. v. First Indem. of Am. Ins. Co., 145 N.J. 345, 353 (1996) (quoting Amelco Window Corp. v. Fed. Ins. Co., 127 N.J. Super. 342, 346 (App. Div. 1974)). Traditionally, these relationships involve three parties: "an obligee who is owed a debt or duty; a primary obligor, who is responsible for the payment of the debt or performance of the duty; and a secondary obligor, or surety, who agrees to answer

for the primary obligor's debt or duty." Cruz-Mendez v. Isu/Ins. Servs. of San Francisco, 156 N.J. 556, 568 (1999). The obligee has an enforceable cause of action to recover on the debt from the surety "if the surety promises in the bond, either in express words or by reasonable implication, to pay money to him." Eagle Fire Prot. Servs., supra, 145 N.J. at 353-54.

New Jersey does not have as extensive a body of suretyship law as do some other states, as evidenced by the parties' extensive reliance on out-of-state authority. We do, however, have some well-established principles to guide a court's interpretation of a surety bond, most notably that when a bond incorporates a contract by reference, the bond and the contract must be considered as one integrated document in ascertaining the meaning of the bond's provisions. Id. at 356-57.

Here, despite the performance bond's explicit reference to Strober's contract for the Science Hall Addition at WPU dated November 11, 2008, the Law Division declined to consider the contract in interpreting the language of the bond. Instead, relying on the well-established principle "that a surety is chargeable only according to the strict terms of its undertaking and its obligation cannot and should not be extended either by implication or by construction beyond the confines of its contract," Monmouth Lumber Co., supra, 21 N.J. at 452, the court

concluded that Dobco had no rights under the bond because Colonial's promise was unambiguously to WPU, the stated obligee.

In employing that principle of strict construction in interpreting the bond, we think the trial court erred. The Restatement makes plain that the principle relied on by the trial court, although well known and oft-quoted, applies only after one has determined the extent of the surety's undertaking. It is not to be used to interpret the language creating the surety's obligations under the bond. Instead, the Restatement holds that contracts creating secondary obligations are to be interpreted by the same standards that apply to interpretation of contracts generally. Restatement (Third) of Suretyship and Guaranty § 14 (Interpretation of the Secondary Obligation — Generally) (1996).

The Reporters Notes explain the problem. Observing that "[t]here are few, if any, principles of suretyship law that cause more confusion than the standards of interpretation of contracts creating secondary obligations," the Notes continue:

> The principle adopted by this section, distinguishing interpretation of the contract creating the secondary obligation from the application of substantive principles of suretyship law to that contract, has been stated as follows:
>
> "However, the rule of strictissimi juris requires only that, after the meaning of

> the contract of guarantee has been determined according to ordinary principles of contract construction, the obligations undertaken by the guarantor are to be strictly applied. . . .  Thus, while '[t]he liability of a surety cannot be extended beyond the plain and explicit language of the contract . . . a surety is not entitled to any particular tenderness in the interpretation of the language of the contract.'"  Banco Portuques do Atlantico v. Asland, S.A., 745 F. Supp. 962, 967-68 (S.D.N.Y. 1990) (quoting 63 N.Y. Jur. 2d Guaranty and Suretyship[] § 89 (1987)) (citations omitted).
>
> [Ibid. (alteration in original).]

A close reading of our own law reveals it in accord with the Restatement.  See e.g., Eagle Fire Prot. Servs., supra, 145 N.J. at 356 (noting the rule of strict construction "has been modified, if the language in the construction bond is ambiguous" (citing V. Petrillo & Son, Inc. v. Am. Constr. Co., 148 N.J. Super. 1, 4-5 (App. Div.), certif. denied, 75 N.J. 4 (1977))).  The Restatement approach is further reflected in the Court's admonition that when the bond incorporates the contract by reference, "the bond and the contract must be considered as one integrated document."  Id. at 356.  As such, the bond

> "should be construed in connection with, and in the light of, [the] contract with which it was executed or the performance of which it secures, especially where the bond refers to the contract and makes it part of the bond.  Thus, the bond, the contract, and the

specifications constitute an integrated
obligation, and are to be read together."

[Id. at 357 (quoting 17 Am. Jur. 2d
Contractors' Bonds § 7 (1990).]

Under our ordinary rules of construction, contract provisions are to be "read as a whole, without artificial emphasis on one section, with a consequent disregard for others." Borough of Princeton v. Bd. of Chosen Freeholders of the Cnty. of Mercer, 333 N.J. Super. 310, 325 (App. Div. 2000), aff'd, 169 N.J. 135 (2001). "Literalism must give way to context." Ibid. Applying those standards here, it is inescapable that the bond was intended to secure Strober's obligations under its November 11, 2008 contract with Dobco, notwithstanding the bond's identification of WPU as the obligee. There is no other contract than the one Strober had with Dobco, and Strober owed no obligation of any sort to WPU. We may not ignore the general design of the agreement in ascertaining the sense of particular terms, even one so central as the identity of the obligee. See Krosnowski v. Krosnowski, 22 N.J. 376, 387 (1956).

Having determined that Colonial bound itself to answer for Strober's performance under the subcontract, we are led ineluctably to conclude that Colonial agreed to do so in the manner specified therein, that is, on Dobco's own form. The

Dobco/Strober subcontract makes absolutely clear that Strober agreed to provide Dobco with a performance bond in the sum of $890,000 in the form annexed to the agreement. The hallmark of a contract of suretyship is the surety's direct and primary undertaking to answer for the performance of the principal. Cruz-Mendez, supra, 156 N.J. at 569 (noting "the unique characteristics of suretyship remain intact in New Jersey, Newark Fin. Corp. v. Acocella, 115 N.J.L. 388 (Sup. Ct. 1935) (explaining that surety undertakes 'direct and primary' obligation, as distinguished from guarantor, whose obligation is 'secondary' and 'collateral')").

Here, Strober undertook to produce a performance bond in a required sum on a particular form. When Colonial agreed to bond that performance, it undertook the obligation to do so in the form required by the contract. That Colonial chose not to review the contract it bonded cannot relieve it of obligations voluntarily undertaken. It has long been the law of this State that "[t]he surety is chargeable with knowledge of the contents of the contract it undertook to guarantee." Jersey City Water Co. v. Metropolitan Const. Co., 76 N.J.L. 419, 421 (Sup. Ct. 1908). The law of other jurisdictions is in accord. See e.g., Western N. Y. Life Ins. Co. v Clinton, 66 N.Y. 326, 331-32 (1876) ("It is the duty of the sureties to look out for

A-1113-12T4

themselves and ascertain the nature of the obligation embraced in the undertaking, and any other rule would not only work serious inconvenience, but render securities of this character of but little, if of any, value."); see also Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 235 (2d Cir. 1995) (decided under New York law). Accordingly, we disagree with the Law Division that Dobco required expert testimony to establish the existence of a duty on the part of the surety to inform itself of its obligations under the agreement incorporated in its bond.

Because we conclude that by entering into its contract with Strober and accepting Strober's premium payment, Colonial voluntarily obligated itself to issue its bond in the form required by the Dobco/Strober subcontract, we reject the Law Division's finding that reformation was unavailable here. Reformation based on mutual mistake requires clear and convincing evidence that the parties' minds have met in a prior existing agreement that their written agreement fails to express. Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 608 (1989). The Court has explained "that in the context of situations where a writing inaccurately reflects the parties' agreement or intentions, 'mutual mistake requires that both parties are in agreement at the time they attempt to reduce their understanding to writing, and the writing fails to express

that understanding correctly.'" Id. at 609 (quoting St. Pius X House of Retreats v. The Diocese of Camden, 88 N.J. 571, 579 (1982)).

Here, there can be no doubt that Strober and Colonial both intended that Colonial would bond Strober's obligations under its November 11, 2008 contract to perform the roofing work at WPU because the bond Colonial issued references an agreement for such work dated November 11, 2008, and there is no other contract to which that reference could apply. Colonial's failure to correctly identify the obligee and to issue its bond on the form incorporated in the Dobco/Strober subcontract did not result from any failure of a meeting of the minds between Colonial and Strober but solely from Colonial's election not to review the contract it had agreed to bond. As our law charges the surety with knowledge of the Dobco/Strober subcontract, reformation is the appropriate remedy in these circumstances.

Finally, we reject Colonial's argument that it was relieved of its obligation to Strober by Dobco's supposed rejection of the non-conforming bond[5] Strober tendered to Dobco. While

---

[5] We refer here to the Colonial bond. Our resolution of the appeal makes it unnecessary for us to consider the parties' arguments concerning the second Strober "bond," only a copy of which was ever sent to Dobco, and without the surety disclosure statement and certification, general power of attorney and financial disclosure.

Colonial argues that the law requires acceptance of the bond by the obligee before the surety is chargeable, no New Jersey case says so, although that appears generally to be the law elsewhere, at least with regard to the older cases.[6] See, e.g., Rachman Bag Co., supra, 46 F.3d at 238 (2d Cir. 1995) (discussing traditional requirements of delivery and acceptance under New York law).

Although we have found no New Jersey authority on the necessity of acceptance of a surety bond by the obligee, the few New Jersey cases treating delivery in the context of a suretyship make clear that in this area, as in others, our law does not exalt form over substance. See, e.g., Real Estate-Land Title & Trust Co. v. Stout, 117 N.J. Eq. 37, 41-43 (1934) (finding no delivery where delivery made in absence of all required signatures); State Bank at Trenton v. Evans, 15 N.J.L. 155, 161 (Sup. Ct. 1835) (finding bond inoperative in the hands

---

[6] More modern authority suggests, at least in the area of construction contract suretyship where custom and industry practice is well established, that the surety's communication to the obligee of its intent to be bound is sufficient to bind the surety before execution and delivery of the bonds in final form. See Turner Construction Co. v. First Indemnity of America Insurance Co., 829 F. Supp. 752, 760-61 (E.D. Pa. 1993) ("Pennsylvania statutory law confirms the conclusion that [the surety's] letter of intent on September 29, 1990 as a matter of industry practice and [the surety's] express words constituted a binding and enforceable surety contract even before execution and delivery of the bonds in their final form").

of the obligee, by whatever means he got possession, until condition of its delivery is performed); Folly v. Vantuyl, 9 N.J.L. 153, 158-59 (Sup. Ct. 1827) (noting "[t]hat there is no precise or set form in which a delivery must be made" and finding constructive delivery to obligee with words "here is your bond, what shall I do with it").  The common law requirement of delivery to the obligee was based on solicitude for guarantors and accommodation parties, many of whom formerly were individuals not receiving any remuneration for their promises.  See, e.g., Peoples Nat'l Bank of N.J. v. Fowler, 73 N.J. 88, 98-100 (strictly construing surety's obligation where surety uncompensated), cert. denied, 434 U.S. 858, 98 S. Ct. 182, 54 L. Ed. 2d 131 (1977); Bank of Tarboro v. Fidelity & Deposit Co., 38 S.E. 908 (N.C. 1901) (distinguishing between private and paid sureties).  The older cases hold that notice of acceptance to the surety was required in the case of non-absolute obligations because the surety would not otherwise know whether it was obligated on its offer, Acme Mfg. Co. v. Reed, 47 A. 205, 206-08 (Pa. 1900) ("a party giving a letter of guaranty has a right to know whether the person to whom it is addressed means to hold him ultimately responsible, inasmuch as his own caution and vigilance may, in a great measure, be regulated by his knowledge of the fact"), or whether its form was acceptable

to the obligee, see Fidelity & Deposit Co. v. West Point Construction Co., 344 S.E.2d 268, 269-70 (Ga. Ct. App. 1986) (discussing contract requirement that performance bond be provided in form acceptable to the contractor).

Because no New Jersey case requires acceptance by the obligee before the surety can be charged, we are not called to consider whether such precedent, founded in a different era in consideration of a variety of instruments many of which are now obsolete, should apply to this performance bond issued for consideration by an insurance company specializing in contract surety. Instead, our focus is on the substance of the Dobco/Strober subcontract Colonial voluntarily undertook to bond.

Dobco was entitled by the terms of that agreement to a performance bond in the sum of $890,000 on the specific form incorporated therein. By contracting with Strober to bond Strober's obligations under its subcontract with Dobco, Colonial obligated itself to issue the performance bond on Dobco's form. Colonial is in the business of writing surety bonds, and it accepted a premium from Strober for this bond, which it has never returned. Under these circumstances, we have no hesitation in rejecting Colonial's argument that Dobco's unwillingness to accept less than what it contracted for, and

Colonial promised, relieved Colonial of its contractual obligation to Dobco.

Reversed and remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION